Jennifer T. NAYLOR, et al., Plaintiffs,

v.

LEE'S SUMMIT REORGANIZED SCHOOL DISTRICT R–7, et al., Defendants.

No. 88–0767–CV–W–8.

United States District Court, W.D. Missouri, W.D.

Jan. 11, 1989.

Arthur A. Benson, II, Benson & McKay, Kansas City, Mo., James S. Liebman, Columbia University School of Law, New York City, Theodore M. Shaw, Los Angeles, Cal., Julius Chambers, James M. Nabrit, II, New York City, for plaintiffs.

George Feldmiller, Kirk May, Stinson, Mag & Fizzell, Kansas City, Mo., for defendants Lee's Summit and N. Kansas City school districts.

Norman Humphrey, Jr., Independence, Mo., for defendant Independence school dist.

John W. Simon, Asst. Atty. Gen., Jefferson City, Mo., for defendant State of Mo., Ashcroft, Bailey, Bartman and members of Bd.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

Plaintiffs filed this lawsuit on August 9, 1988 alleging that the defendant school districts refused them admission as nonresident students in violation of the Fourteenth Amendment to the Constitution of the United States, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq.* and 42 U.S.C. §§ 1981 and 1983. Plaintiffs seek a permanent injunction of the enforcement of defendant school district's admission requirements for black nonresident students, as well as monetary damages for the violation of each plaintiff's constitutional rights. Several motions are currently before the court: motions to dismiss and motions for summary judgment filed by each of the defendant suburban school districts (SSDs); the motion of the state defendants for summary judgment and the plaintiffs' alternative motion for partial summary judgment against the state defendants; and the joint motion of the defendant school districts for sanctions pursuant to Fed.R.Civ.P. 11.[1] The court will address these motions in three groups: school districts' dispositive motions, state's motion and plaintiffs' cross motion, and motion for sanctions.

### I. *Facts*

Plaintiffs in this suit, each of whom is black and resides within the boundaries of the Kansas City, Missouri school district (KCMSD), attempted to enroll in either the Lee's Summit Reorganized School District (LSRSD), the North Kansas City, Missouri School District (NKCSD) or the Independence School District (ISD) but were refused admission because they were not residents of the school district and did not fall within any of the district's guidelines for

the admission of nonresident students. On January 6, 1989 the court certified this case as a class action[2] with three subclasses, one for students applying to each of the defendant SSDs. As will be discussed in greater detail later in this opinion, each of the school districts gave somewhat different reasons for refusing to enroll plaintiffs although each of the districts justified its decision, at least in part, on the fact that plaintiffs were not residents of the district to which they applied nor did they fall within any of the exceptions allowing for the admission of nonresident students.

Each of the students here involved attempted to enroll in one of the defendant suburban school districts because of Judge Russell G. Clark's decision in *Jenkins v. State of Missouri,* 639 F.Supp. 19 (W.D. Mo.1985), *aff'd,* 807 F.2d 657 (8th Cir.1986), *cert. denied sub nom., Kansas City, Missouri School District v. Missouri,* —— U.S. ——, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). In that order Judge Clark directed that "the State of Missouri shall actively seek the cooperation of each school district in the Kansas City, Missouri metropolitan area in a voluntary interdistrict transfer program." *Id.* at 38. Plaintiffs allege that defendants had a duty, under Judge Clark's order, to develop nondiscriminatory voluntary interdistrict transfer programs (VITs) and that the school districts' refusals to admit the plaintiffs as nonresident students were based on race and, therefore, constituted a violation of plaintiffs' constitutional rights.

The plaintiffs began preparations to enroll in the SSDs in May 1988. At that time plaintiffs' attorney wrote a letter to George Feldmiller, one of defendants' attorneys, stating that the plaintiffs and KCMSD district had developed a proposal for a VIT program under which plaintiffs would present themselves for admission at one of the defendant SSDs. Appendix to Plaintiffs' Memorandum, Exhibit 11 (hereinafter "Appendix"). The defendant SSDs re-

---

1. Although no formal written motion has been filed, the state joins in this motion. *See, infra,* at 819.

2. Each of the plaintiffs in this case is also a member of the class in *Jenkins v. State of Missouri. See* Transcript of Aug. 18, 1988 Hearing at 25. In other words, the *Naylor* class is a subgroup of the *Jenkins* class.

sponded that they were working with the state on proposals of their own and warned that any overstepping or threats of litigation by the plaintiffs would slow the process. Correspondence was exchanged throughout the summer months between the respective counsel for plaintiffs, the SSDs and the state. None of the SSDs had a plan in effect by late summer of 1988 and, consequently, each of the plaintiffs attempted to enroll in one of the defendant districts pursuant to the plan proposed by counsel for plaintiffs in May. Their applications were rejected and this litigation followed.

In order to understand the issues raised by this lawsuit it is necessary briefly to review the previous Kansas City, Missouri desegregation litigation, especially the court's orders in *Jenkins*. All of the defendants, as well as other SSDs, were originally named as defendants in *Jenkins* but on June 5, 1984 Judge Clark dismissed the suburban school district defendants from *Jenkins* because they were not constitutional violators under the standards announced by the Supreme Court in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). *See Jenkins v. Missouri*, No. 77–0420 (W.D.Mo. June 5, 1984) (unpublished opinion). As a result of this finding, Judge Clark concluded that the

suburban districts could not be required to participate in an interdistrict remedy to desegregate the Kansas City, Missouri School District. *Id.* at 103–04. Judge Clark later ordered, however, that the state of Missouri, as a constitutional violator, had a duty to seek the cooperation of the suburban school districts in a voluntary interdistrict transfer program and to pay all transportation and tuition costs of any black KCMSD student wishing to transfer to a suburban school district where their race was in the minority. *Jenkins*, 639 F.Supp. at 38. Judge Clark noted that "[i]f any of the suburban districts volunteer to participate in inter-district transfers, the program shall begin with the 1986/87 school year." [3] *Id.* at 39.

While Judge Clark's order encouraged the development of VIT programs, he clearly stated that the participating districts would not have unlimited discretion over how the programs operated, noting that

> [t]he receiving district will agree not to reject individual applicants unless there is a history of serious disciplinary problems, will allow the transfer student to remain in attendance until such student graduates or returns to the student's home district, as long as that student satisfies all academic and other stan-

---

**3.** A question exists as to whether the transfer program proposed by plaintiffs and at issue in this case falls under the umbrella of Judge Clark's remedy order. In that order Judge Clark noted that *"the state of Missouri shall actively seek* the cooperation of each school district in the Kansas City, Missouri metropolitan area in a voluntary interdistrict transfer program." (emphasis added.) The state argues that it was not required to fund the tuition and transportation costs of the plaintiff students in this case because the plan was established by plaintiffs rather than by the state of Missouri. The Desegregation Monitoring Committee (DMC), established pursuant to Judge Clark's remedy order, 639 F.Supp, at 41–43, found that the state had a duty to fund these transfers under the court's order in *Jenkins*. The state appealed that decision to Judge Clark. On November 29, 1988 Judge Clark issued an order denying the state's appeal of the DMC's decision as moot since the parties agreed that no students would be attending the SSDs during the 1988–89 school year. The state also appealed that portion of the DMC's decision which found that the plaintiffs' plan to seek voluntary inter-

district transfers was consistent with Judge Clark's order in *Jenkins*.

Judge Clark affirmed the DMC's decision, noting that "there is nothing in the prior [*Jenkins*] orders preventing the other parties from seeking the cooperation of other school districts in a VIT program. This is evidenced by the Court's statement that 'the newly created voluntary interdistrict transfer subcommittee of the Desegregation Monitoring Committee is fully committed to assisting the State *and the other parties* in developing a voluntary interdistrict transfer program.'" *Jenkins*, No. 77–0420–CV–W–4 (Nov. 29, 1988) at 5 (unpublished opinion) (quoting January 7, 1988 Order at 14) (emphasis added to original). Judge Clark gave plaintiffs twenty days to demonstrate that their proposed VIT program, the program under which plaintiffs in the present case applied to the SSDs, meets the requirements set forth in the court's earlier *Jenkins* order. Plaintiffs' response was due December 19, 1988 and defendants were given an extension of time until January 10, 1989 to reply. As of this date, Judge Clark has not ruled on the state's motion to reconsider the decision of the DMC.

dards applicable to all resident students, will treat interdistrict transfer students in the same manner, in all regards, as they treat resident students, and will permit KCMSD to recruit applicants for interdistrict transfers within its district. *Id.* at 39.[4]

The Eighth Circuit affirmed Judge Clark's dismissal of the suburban school districts, holding that the district court did not err in finding that the SSDs were not constitutional violators and, therefore, that a mandatory interdistrict remedy was not permissible under *Milliken*. *Jenkins by Agyei v. State of Missouri*, 807 F.2d 657, 664 (8th Cir.1986), *cert. denied sub nom.*, *Kansas City, Missouri School District v. Missouri*, — U.S. ——, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). The court noted in a footnote, however, that although the district court did not have the power to mandate a voluntary interdistrict transfer program, the refusal of a district to participate in such a program could be evidence of a constitutional violation. Specifically, the court stated that "[w]hether a refusal of a district to participate in such a voluntary program may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation is an issue that we should not anticipate." *Id.* at 683, n. 30.[5] Judge Ross wrote a separate concurring opinion "to emphasize to the parties in this case the importance of the admonition in footnote 30." Judge Ross emphasized that "the failure to organize and implement this program would be a very significant factor in determining discriminatory intent in the future litigation which is certain to result from the further processing of this case." *Id.* at 687 (Ross, J., concurring).[6]

Plaintiffs contend that footnote 30, coupled with Judge Ross' separate concurrence, establishes that the suburban school districts could be found liable for a constitutional violation, separate and distinct from that litigated in *Jenkins*, if the SSDs unlawfully discriminated against plaintiffs by refusing to participate in plaintiffs' proposed voluntary interdistrict transfer plan. Specifically, plaintiffs allege that the reasons advanced by the SSDs for refusing to admit the plaintiffs as nonresident students were merely pretextual and that the true reason that the defendant SSDs did not admit plaintiffs was that they did not want black KCMSD students in their schools. Defendants refute this contention, arguing that plaintiffs' claims are precluded by the Eighth Circuit's decision affirming Judge Clark's dismissal of the SSDs in the *Jenkins* litigation. In addition, defendants argue that plaintiffs were refused admission to the SSDs not because they were black KCMSD students but because they did not meet the requirements for admission of nonresident students as established by the separately stated written policies of each of the defendant suburban school districts.

### A. Lee's Summit Nonresident Policy

The most current Lee's Summit Reorganized School District policy regarding admission of nonresident students was approved on October 8, 1987 and contains three exceptions to the general policy that nonresident students will not be accepted to LSRSD schools. First, the school district will accept, on a tuition paying basis, any student originally attending the school district as a resident student who later moves out of the district, so long as the student remains in continuous enrollment. The district will also give a tuition/tax credit to any nonresident student whose

---

4. The "Monitoring Committee" refers to the Desegregation Monitoring Committee, a committee established by Judge Clark to oversee the desegregation remedy.

5. The majority opinion was written by Judge John R. Gibson and joined by Judges Ross, Fagg and Wohlman.

6. Judge Arnold dissented from that part of the majority opinion finding that the SSDs did not

have a duty to participate in an interdistrict remedy. Judge Lay, joined by Judges Heaney and McMillan, dissented from the majority opinion because they found that the majority misinterpreted the Supreme Court's decision in *Milliken* and they believed that the SSDs should have been required to participate in an interdistrict remedy. Judge Bowman did not participate in the court's consideration of the case.

parents or guardians pay school taxes on property located within the district. Finally, any student whose parents anticipate moving into the district and have a house currently under construction will be admitted and are provided a ninety-day grace period before tuition must be paid. Appendix, Exhibit 9B.

The board's policy also allows nonresident students to attend the LSRSD without paying tuition, or upon payment of partial tuition, under the following circumstances: if the student lives with a grandparent with the parents' permission and the purpose of the living arrangement is not solely to allow the child to attend the Lee's Summit Schools; if the student is an orphan who has a permanent or temporary home within the school district; if a child lives with one parent and has a permanent or temporary home within the district; if a child has parents who do not contribute to his or her support and the child is unable to pay tuition but has a permanent or temporary home within the district; if the student is sponsored by an agency meeting the standards specified in a policy titled "Policy JECBA";[7] and/or if the student moves out of the district after the end of the third quarter of the school year, he or she may attend school in the district for the balance of the term.

Affidavits of various officials of the LSRSD established that it has been the board's policy to allow only students falling into one of the above categories to attend a school located within the district as a nonresident student. *See* Affidavit of Stan Magady, Superintendent of Lee's Summit Reorganized School District R–7 from 1984 to June 1988 at ¶¶ 3, 11; Affidavit of Marvin Kirby, Counselor in Division 2, Lee's Summit High School at ¶ 4 ("if a resident was not within the district, I informed the

parents that their children would not be enrolled unless they owned property in the district"); Affidavit of Gail Williams, Acting Superintendent of Lee's Summit R–7 School District at ¶¶ 2, 12 ("based on my understanding of the circumstances of each black KCMSD applicant, they were denied admission because they did not come within the district's nonresident admission policy and practices"). Twenty-three nonresident students are attending LSRSD schools during the current school year based on their parents' property ownership; two nonresident property owners are paying tuition to the LSRSD school district and twenty-one nonresident homeowners are paying tuition to the district while awaiting the completion of a home under construction or waiting for a contract on a home to close. Williams Affidavit ¶ 6.[8] While the district knows that two of these families are black, it is unsure of the race of all the students. August 17, 1988 Letter to Arthur Benson from Kirk May, Appendix, Exhibit 17 at 3. In addition, thirty-four nonresident students whose parents are not property owners are attending school in the district for various reasons, each of which is articulated in the policy. One of these students is black and the others are white or of unknown racial background. *Id.* at 1–2.

### B. North Kansas City Nonresident Policy

Like LSRSD, the North Kansas City School District has a written policy regarding the acceptance of nonresident students. The district admits nonresident students only under one of the following circumstances: (1) the student is enrolled in a special education program, although resident students have priority, and the home district pays the student's tuition and provides transportation, (2) a student who legally resided within the NKCSD "during

---

7. The parties did not submit a copy of this policy.

8. Lee's Summit generally does not accept special education students from other school districts. In the past few years, however, one child who was classified as having a behavioral disorder remained in the district after the child's family moved to Pleasant Hill School District at midyear. The child was allowed to complete

the last four months of the school year as a tuition paying student at Lee's Summit under the district's nonresident policy allowing students to complete the school year in the district. Also, one special education student, who was a ward of the state, attended the school district for fifteen days pursuant to an arrangement with the Kansas City Regional Center which paid the child's tuition.

the school year" may continue to attend school until the end of the year if his or her family moves from the district, provided that tuition is paid and transportation is provided for the student, (3) orphans, children with only one living parent, and children whose parents do not contribute to their support may attend a school within the district without paying tuition if they have established a permanent or temporary home within the district, or (4) a nonresident student who has a parent who pays a school tax based upon ownership of property within the district may attend school within the NKCSD and receive a credit for tuition on the amount paid in the tax. Appendix, Exhibit 9C.

The NKCSD has admitted a total of ten nonresident students under this policy in the years between 1984–85 and 1987–88.[9] Appendix, Exhibit 22. Eight of these students were special education students whose tuition was paid by the Park Hill School District. One of the students was allowed to finish her senior year at Winnetonka High School after her parents moved from the district, and the remaining student had parents who owned property and paid taxes within the district. *Id.* All of these students are white. *Id.*

C. Independence Nonresident Policy

The Independence School District (ISD) has a policy which provides that nonresident students will be permitted to attend ISD schools if they qualify for admission pursuant to Mo.Ann.Stat. §§ 167.151(2) and (3) (the provisions relating to orphans and individuals entitled to a tax credit for the amount of property tax paid within the district), if they are exchange students under the sponsorship of the American Field Services, or if they are between the ages of six and twenty, who are temporarily within the district for the purpose of attending

school, and their admission has been approved by the Office of Pupil Personnel and their tuition has been paid. Appendix, Exhibit 9A. In addition to the exceptions contained within the written policy, the ISD occasionally accepts students with behavioral disorders or orthopedic handicaps with the authorization of the Independence Board of Education. Under this program the sending school district conducts a diagnostic review of the student, which ISD reviews prior to accepting the student.[10] ISD Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction at 3–4.

The ISD has accepted twenty-three students under section 167.151(3), the property tax provision, in the school years between 1984–85 and 1987–88. Appendix, Exhibit 23. Twenty-one of these students are white, none are black and two are members of other minority groups. The school district has accepted three students in each of the last two years under section 167.151(2), the provision relating to orphan children. These students all resided on Drumm Farm, a private facility located within the Independence School District which houses children from broken homes. Drumm Farm is located within the boundaries of the ISD. *Id.* All of these students are white. The Independence School District has enrolled approximately 100 special education students between the 1984–85 and 1988–89 school years.[11] *Id.* Of these 100 students, three are black and four are members of other minority groups. The information provided by the parties does not state if any minority children applied to the ISD for special education programs and were denied admission.

II. *Summary Judgment Standard*

■ Each of the SSDs has filed a motion to dismiss for failure to state a claim and a motion for summary judgment. Because

---

9. Several of these students were enrolled in NKCSD schools for more than one year.

10. ISD suggests in its memorandum opposing plaintiffs' motion for a preliminary injunction that its acceptance of special education students falls under the district's written policy. The written policy provides only for admission of orphans, students whose parents pay taxes on property within the district, American Field Services Students and students who are residents of other countries and are only temporarily within the district. The court is unsure of the basis for ISD's statement that the written policy provides for the acceptance of nonresident, special education students.

11. The information for 1988–89 is a projection.

the motions to dismiss are supplemented with affidavits and other materials, this court will treat them as additional motions for summary judgment under Fed.R.Civ.P. 12(b) which provides that motions to dismiss for failure to state a claim that include matters outside the pleadings will be treated as motions for summary judgment. *See, e.g., Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (when motion to dismiss for failure to state a claim included matters outside of pleadings, court was required to treat it as a motion for summary judgment); *Abramson v. Mitchell,* 459 F.2d 955, 957 (8th Cir.1972) ("Where matters outside the pleadings must be considered, the court is required by Rule 12(b) and (c) of the Federal Rules of Civil Procedure to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56."). Thus, in reviewing defendants' various motions this court must consider whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In making this determination the court is guided by the Supreme Court's reminder that summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.Proc. 1). Thus,

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.*

The Supreme Court has explained that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden of Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ") (footnote and citations omitted) (emphasis in original); *Osborn v. E.F. Hutton & Co., Inc.,* 853 F.2d 616, 618 (8th Cir.1988) ("In order to preclude the entry of summary judgment, it is incumbent upon the nonmoving party to make a sufficient showing on every essential element of its case on which it bears the burden of proof."); *Buford v. Tremayne,* 747 F.2d 445, 447 (8th Cir.1984) (Summary judgment may "not be granted unless the moving party has established the right to a judgment with such clarity that there is no room for controversy. . . . However, parties opposing summary judgment motions may not rest upon the allegations in their pleadings, the non-movant must resist the motion by setting forth specific facts showing there is a genuine issue of fact for trial.") (citations omitted). It is with this standard in mind that the court reviews the various grounds advanced by defendants in support of their motions for summary judgment.

### III. *The Jenkins Litigation*

#### A. Res Judicata Argument

Defendants first argue that summary judgment should be granted because Judge Clark's decision in *Jenkins* is dispositive on the issues presented in the present case. Specifically, the SSDs argue that they cannot be required to participate in voluntary

interdistrict transfer plan because the previous decisions of both Judge Clark and the Eighth Circuit establish that they have no constitutional obligation to remedy the violation of plaintiffs' equal protection rights by the KCMSD and the state of Missouri. In other words, defendants argue that the previous decisions in *Jenkins* are res judicata for purposes of the present case.

Under the doctrine of res judicata "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Defendants argue that since the *Jenkins* court ruled against plaintiffs on the question of whether the SSDs were constitutional violators, and therefore had a duty to participate in a VIT program, the issues resolved in *Jenkins,* cannot "be collaterally attacked and the question or fact once determined must, as between the same parties, be taken as conclusively established and accorded res judicata effect." *Insurance Co. of North America v. Bay*, 784 F.2d 869, 873 (8th Cir.1986). *See also Poe v. John Deere Co.,* 695 F.2d 1103, 1105–06 (8th Cir.1982) (to determine whether res judicata precludes relitigation of an issue a court must look "to whether proof of the same facts will support both actions, or to whether the wrong for which redress is sought is the same in both actions").

The doctrine of res judicata has been applied in school desegregation cases. *See, e.g., Bronson v. Board of Education*, 525 F.2d 344 (6th Cir.1975), *cert. denied sub nom., Ohio State Board of Education v. Bronson*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976). Plaintiffs in *Bronson* brought suit alleging that the school system of Cincinnati was segregated in violation of the fourteenth amendment to the Constitution. An earlier decision of the Sixth Circuit had affirmed the district court's decision that the segregation was not a result of the actions of Cincinnati school officials. The court noted that the plaintiffs in *Bronson,* like those in the present case, were substantially the same as those in the earlier litigation and that "an application of strict res judicata principles would bar any further litigation between the parties...." *Id.* at 347. As a result, the court held that the parties to the *Bronson* case were "foreclosed from 'the relitigation of essential facts or issues which were previously litigated by the parties (or their privies) and judicially determined.'" *Id.* at 347 (quoting the unpublished opinion of the district court).

▮ Defendants correctly argue that the doctrine of res judicata, or the more narrow doctrine of collateral estoppel,[12] precludes plaintiffs in the present case from arguing that the defendant SSDs are required to participate in a VIT program. That issue was fully litigated in *Jenkins.* Thus, to the extent that plaintiffs argue that the defendant SSDs have violated plaintiffs' constitutional rights at any time prior to the resolution of the *Jenkins* litigation, the defendants' motion for summary judgment must be granted.

### B. Plaintiffs' Claims of New Violations

Plaintiffs apparently concede that they are bound by the courts' earlier determination that the SSDs are not constitutional violators. *See* Plaintiffs' Memorandum in Opposition to Individual and Consolidated Motions and Memorandum of Defendants at 1–2 (hereinafter "Plaintiffs' Opposition") (plaintiffs do not "desire to relitigate in the pending litigation any matter resolved against them in *Jenkins v. Missouri* ..."). Instead, plaintiffs argue that the present lawsuit is premised on the SSDs' post-*Jenkins* refusal to accept minority KCMSD students as nonresident pupils pursuant to plaintiffs' proposed voluntary interdistrict transfer plan.[13] Plaintiffs' argument is

---

**12.** Professor Wright notes that res judicata is the term used to encompass "all of the ways in which one judgment will have a binding effect on another." The term is used to refer to both issues that were never actually litigated, "true res judicata," and issues that were litigated, "collateral estoppel." Wright, *Law of Federal Courts* at 680 (4th Ed.1983).

**13.** Plaintiffs make identical allegations against the defendant State of Missouri, arguing that the state is violating plaintiffs' rights to equal pro-

premised, in large part, on dicta in the Eighth Circuit's decision affirming Judge Clark's decision in *Jenkins*. As discussed earlier, the Eighth Circuit noted that

> the district court is correct in its holding that such a program cannot be mandatorily imposed upon the record before the court. Whether a refusal of a district to participate in such a voluntary program *may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation* is an issue that we should not anticipate.

*Jenkins*, 807 F.2d at 683 n. 30 (emphasis added). Thus, plaintiffs argue that defendants' post-*Jenkins* refusal to admit plaintiffs as nonresident students evidences an entirely new constitutional violation, one that was not litigated in *Jenkins*. As a result, the question before this court is a narrow one: whether the SSDs refused to admit plaintiffs as nonresident students because of their race, in violation of the fourteenth amendment to the United States Constitution or whether the students were refused admission for legitimate, nondiscriminatory reasons.

## IV. *Refusal of Plaintiffs' Applications*

### A. Lee's Summit Refusal

Plaintiffs argue that LSRSD cannot rely on its nonresident policy as a reason for denying admission to plaintiffs because the district initially stated that plaintiffs' applications were denied because

> the State of Missouri has taken the position that it is not obligated to pay tuition or transportation costs for these students and that it intends to appeal the Desegregation Monitoring Committee's decision to the contrary. Given the State's position, the district believes that the requests of these parents and guardians is [sic] moot. I should make it clear, however, that Lee's Summit has not made any final decision about its position if the State loses its appeal or if the State's position changes.

July 27, 1988 Letter to Dr. Terry Stewart, Coordinator Department of Elementary and Secondary Education from George E. Feldmiller, counsel for Lee's Summit R–7 School District, Appendix, Exhibit 11. Approximately two weeks later, on August 17, 1988, LSRSD stated that "plaintiffs were denied admission because, to the district's knowledge, they did not come within the district's policy and practice concerning admitting nonresident students." Defendant LSRSD's Response to Plaintiffs' Requests 8–10, Appendix, Exhibit 3 at 2. A similar explanation of the district's decision to deny plaintiff children admission to the district was made on August 26, 1988 by Margaret Piepergerdes, a former LSRSD school board president. In an affidavit Piepergerdes stated that the district's policy is "to accept nonresident students only as required by law, and in the rare situation where a student's family moves out of the district...." Affidavit at ¶ 2. Plaintiffs argue that the district's inability to provide a consistent reason for the denial of plaintiffs' request to attend school in the LSRSD establishes at least an inference of racial discrimination.

### B. North Kansas City Refusal

Plaintiffs make similar allegations in regard to the NKCSD. Like LSRSD, the NKCSD argues that it is entitled to summary judgment because the plaintiff children were refused admission, not because of their race, but because they do not fall under any of the exceptions contained in the district's nonresident student policy. Plaintiffs argue that the NKCSD did not rely on its nonresident policy in its decision to refuse admission to the plaintiff students but, rather, denied plaintiffs' applications based on discriminatory criteria contained in the district's proposal for a voluntary interdistrict transfer program for the 1989/90 school year.

A letter explaining this reasoning was sent to the parents of each plaintiff who applied for admission to the NKCSD. *See* Appendix, Exhibit 11 at 20. This letter was accompanied by a copy of a letter written by George Feldmiller, attorney for NKCSD, listing eleven conditions contained

tection by refusing to pay for the costs of tuition and transportation to the SSDs.

in the district's proposal for 1989/90. These conditions include (1) giving the district sole authority to determine how many students to admit to the voluntary program, (2) requiring the parent of each student accepted for enrollment to sign a pledge that the parent will support the student's activities and will immediately be available for consultation with school officials, (3) the state of Missouri's agreement to provide whatever financial support is necessary to finance the program, (4) the agreement of Kansas school districts to accept KCMSD students on a voluntary basis, (5) giving NKCSD final authority over all issues relating to the voluntary plan, (6) a stipulation that neither the state nor any other group will take any action which might lead to NKCSD becoming a party to future court proceedings, (7) an agreement that the state, KCMSD and the plaintiff class in *Jenkins* will provide full and unqualified indemnity to the district for any litigation which may result from the district's acceptance of the students, (8) an agreement by all attorneys who represented the plaintiff class or the school district in *Jenkins* to refrain from any future legal proceedings, and (9) an agreement that NKCSD would be fully reimbursed for all fees, lawyers' time and other expenses attributable to the *Jenkins* litigation. July 19, 1988 Letter from George Feldmiller to Dr. Terry Stewart, Appendix, Exhibit 11.

Plaintiffs argue that NKCSD discriminated against plaintiffs by imposing requirements upon the plaintiff class that are not applicable to residents of the district or to other white nonresident students. Thus, plaintiffs conclude that the proposal advanced by the NKCSD for the enrollment of black, KCMSD students is evidence of a new, post-*Jenkins* constitutional violation.

### C. Independence Refusal

Finally, plaintiffs argue that the ISD used discriminatory criteria in deciding to refuse admission to the plaintiff class. According to plaintiffs, the ISD did not make any attempt to base its rejection of the plaintiffs on its nonresident policy but, instead, stated that the students were not admitted based on a VIT program which was proposed to the state in a July 26, 1988 letter to Dr. Terry Stewart from Norman Humphrey, ISD attorney. Appendix, Exhibit 11 at 26. Under this proposal the state of Missouri would purchase a site and construct an elementary school within the boundaries of the Independence School District. Half of the students attending this school would be white students from ISD and half would be minority students from KCMSD. In addition, the ISD would participate in the plan only if three other conditions were met: (1) the district would be reimbursed for all attorneys' fees and costs incurred in defending the *Jenkins* litigation, (2) KCMSD and the state of Missouri would agree to indemnify ISD in the event any new litigation arose, and (3) all attorneys who represented the plaintiff class in *Jenkins* would agree not to initiate or participate in any further proceedings against the ISD. *Id.* at 25–26.

Plaintiffs further argue that even if the ISD's decision to refuse to admit the plaintiffs was based on the district's nonresident policy, the district administered the policy in a discriminatory manner. Specifically, plaintiffs argue the ISD nonresident policy has been used to admit white students to special education programs while denying requests of minority students for racially integrative instructional programs. In other words, plaintiffs argue that the ISD admitted white, nonresident students for special education programs while denying similar requests from black students who wished to attend the ISD to receive education for another special purpose, namely integrated education.

### V. *Legal Analysis*

In order to prove that defendants discriminated against plaintiffs in denying their applications to attend the SSDs as nonresident students, plaintiffs must show that the SSDs' decision can "ultimately be traced to a racially discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). While this "invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more

heavily on one race than another," the mere fact that the KCMSD schools are predominantly black and the SSDs are predominantly white "is not alone violative of the Equal Protection Clause." *Id.* at 242, 240, 96 S.Ct. at 2049, 2048.

While *Davis* is the starting point for any analysis of discriminatory intent, the Supreme Court expanded on the criteria to be used in determining intent in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Arlington Heights* the Supreme Court noted that its holding in "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Id.* at 265, 97 S.Ct. at 563. Thus, to determine "whether invidious discriminatory purpose was a motivating factor" in a defendant's action the court must first consider whether the impact of the official action "bears more heavily on one race than another." *Id.* at 266, 97 S.Ct. at 563 (quoting *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2049). The court realized, however, that only in rare cases will there be direct evidence of a discriminatory purpose and that in most cases the court will have to consider a variety of other factors before deciding whether an action violates the equal protection clause of the fourteenth amendment. Thus, the Supreme Court has directed trial courts to look to the historical background of the challenged decision, the specific sequence of events leading up to the challenged action, departure from normal procedures, and the legislative or administrative history of the decision. *Id.* at 267, 97 S.Ct. at 564.

In addition to the factors announced in *Davis* and *Arlington Heights,* this court must keep in mind the Supreme Court's more recent admonition that discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Discriminatory purpose implies "that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse affects upon an identifiable group." *Id.*

Courts have often used the standards announced above to determine whether school districts have intentionally discriminated against minority children by denying them opportunities for an integrated education. For example, faced with the question of whether schools located within Marion County, but not necessarily within the Indianapolis public school district, should be required to participate in a busing program, the Seventh Circuit held that schools could be required to participate in a substantial interdistrict effort if, on remand, the district court found that the action of the state or its agents "was made with a racially discriminatory purpose." *United States v. Board of School Commissioners,* 573 F.2d 400, 410 (7th Cir.1978), *cert. denied sub nom., School Town of Speedway, Indiana v. Buckley,* 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980). *See also Diaz v. San Jose Unified School District,* 733 F.2d 660, 662 (9th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985) (plaintiffs seeking to prove that defendants operated a segregated public school system were required "to prove not only that the defendants' actions created or maintained racial or ethnic imbalance in the schools, but also that those actions were motivated by segregative intent"); *United States v. Unified School District No. 500,* 610 F.2d 688, 692 (10th Cir.1979) (while "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation" evidence of these consequences is "relevant evidence to prove the ultimate fact, forbidden purpose" in a school desegregation case) (quoting *Keyes v. School District No. 1,* 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973)); *United States v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir. 1977), *cert. denied sub nom., Austin Independent School District v. United States,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (while plaintiffs alleging that school district had adopted policies which had a segregative effect on Mexican–American

students were required to prove intent, mere evidence of "disproportionate racial impact of the neutral application of a long-standing neutral policy, by itself, will rarely constitute a constitutional violation").

■ Taken together, these cases establish that

> [a]dherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.'

*Little Rock School District v. Pulaski County Special School District No. 1,* 778 F.2d 404, 410 (8th Cir.1985), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986) (quoting *Columbus Board of Education v. Penick,* 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979)). Thus, in the present case this court must determine whether the record leaves open any question of material fact as to whether the SSDs' nonresident policies had the foreseeable consequence of preventing the plaintiff class from attending the SSDs based on their race.

■ Evidence does not exist to support a finding that defendants' actions were taken with the intent to deprive plaintiffs of their rights under the fourteenth amendment. Indeed, the voluminous affidavits, letters, discovery responses and other information currently before the court establish that no genuine issue of fact exists on this matter. Quite simply, plaintiffs have not met their burden of demonstrating that they will be able to show that they were treated in a manner different from that of any other nonresident student or that the nonresident policies were used as a pretext to prevent plaintiffs from attending the SSDs because of their race.

Each of the three SSDs had a specific written policy for the admission of nonresi-dent students.[14] Plaintiffs argue that these written policies either were not used by the defendant school districts or were discarded in favor of unwritten policies or new proposals for voluntary interdistrict transfer programs. Initially, the court notes that only the Lee's Summit School District specifically stated that its refusal to admit the plaintiff students was based on a reason other than the written nonresident policy.[15] In their various briefs in support of the motions for summary judgment, however, each of the defendant districts noted that it was their policy and practice only to admit nonresident students as provided in the appropriate nonresident policy. Each of the SSDs argues that it treated the members of the plaintiff class the same as any other nonresident student, minority or majority, who attempted to attend school in one of the three districts. Indeed, plaintiffs have not brought forth any evidence that the SSDs routinely, or even occasionally, admitted white nonresident students who did not fall under one of the written exceptions.

Even assuming, arguendo, that the defendants relied on some reason other than a nonresident student policy in denying the plaintiffs' applications to the SSDs, plaintiffs have failed to illustrate an issue of material fact which could save them from the entry of summary judgment. Plaintiffs argue that the reliance of both the LSRSD and the NKCSD on proposed voluntary transfer plans shows an intent to discriminate against the plaintiffs by imposing conditions on black, nonresident students that were not, and are not, imposed upon resident students.

While this argument initially sounds compelling, it cannot withstand scrutiny upon closer examination. First, the conditions contained in both the ISD's and the NKCSD's voluntary plans are merely preliminary. When plaintiffs were notified of these conditions, they were also told that

---

**14.** *See supra* at 807–09.

**15.** *See supra* at 812 explaining that LSRSD initially refused to admit the plaintiff students

the plans were not final.[16] The NKCSD proposal specifically stated that the district had not yet finalized plans for its 1989–90 voluntary interdistrict transfer program. In addition, the letter written to parents of the plaintiff students specifically stated that the conditions listed were part of a proposal for the following school year and that the students would not be permitted to attend school in the district under a voluntary plan during the 1988–89 school year. In other words, those plaintiffs who attempted to enroll in the NKCSD were not told that they were denied admission because they did not meet any of the eleven conditions contained in the NKCSD proposal. Rather, they were told that these criteria were part of a proposal for the 1989–90 school year.[17]

■ If the proposal had actually gone into effect when plaintiffs were denied admission, the plaintiffs might be able to prove that the conditions were merely a pretext for keeping minority students out of the NKCSD. The court is unable to find, however, that a mere proposal can serve as the basis for a finding of invidious discrimination. Such a result would almost certainly reduce the willingness of any

school district to participate in such a program since liability for constitutional violations could be premised on each idea that ultimately gives rise to the final plan.

In any event, plaintiffs could not have been denied admission to the SSDs under plans that had not been finalized. Although the court is unsure whether the eleven conditions contained within the NKCSD proposal fall within the guidelines announced by Judge Clark in *Jenkins,* or whether they would pass constitutional muster standing on their own, that question is not currently before the court.

■ In other words, since plaintiffs have failed to show that they were denied admission under the new plan they have failed to "demonstrate sufficient ripeness to establish a concrete case or controversy." *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 579, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985). The basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Id.* at 580, 105 S.Ct. at 3333 (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Put in

because they were unsure as to whether the state would fund the program.

**16.** Since that time, the Independence School District has notified the court of a new plan for voluntary interdistrict transfers. On November 16, 1988 Norman Humphrey, counsel for the ISD, forwarded a copy of the district's proposed voluntary interdistrict transfer plan to the court. This plan proposes to create a school in the Independence School District that would be funded by the state of Missouri pursuant to Judge Clark's desegregation order. The school would be attended by 210 white students from the ISD and 210 black students from KCMSD. All students would be considered "transfer students" for funding purposes. The plan provides that KCMSD students graduating from this school would have the option of enrolling in the ISD secondary school system. Although the court has not extensively reviewed the exhaustive proposal, it does not appear that this plan contains conditions, such as complete reimbursement for attorneys' fees incurred in *Jenkins,* to which plaintiffs objected in the earlier proposal.

**17.** The court notes, without deciding, that it is questionable whether these eleven criteria would qualify as an appropriate VIT under

Judge Clark's remedy order in *Jenkins.* In that order Judge Clark noted that in any interdistrict plan

[t]he receiving district will agree not to reject individual applicants unless there is a history of serious disciplinary problems, will allow the transfer student to remain in attendance until such student graduates or returns to the student's home district, as long as that student satisfies all academic and other standards applicable to all resident students, *will treat interdistrict transfer students in the same manner, in all regards, as they treat resident students,* and will permit KCMSD to recruit applicants for interdistrict transfers within its district.

Several of the conditions stated in NKCSD's proposal for the 1989–90 school year appear to treat KCMSD students differently from the minority KCMSD students, in violation of Judge Clark's order and, perhaps, in violation of the equal protection clause. Thus, it is questionable whether the state would be required to fund this program, another condition set out by NKCSD. In any event, the proposal was not the basis for the district's denial of plaintiffs' request to attend these schools on a voluntary basis.

slightly different terms, the doctrine operates so that

[e]ven when the court concededly possesses jurisdiction to decide a question of constitutional law, it will decline to do so if a less fundamental ground will suffice, or if the issue is not squarely presented in an adversary context, *or if it can be said that the issue is so premature that the court would have to speculate as to the presence of a real injury.*

*Meadows of West Memphis v. City of West Memphis, Arkansas,* 800 F.2d 212, 214 (8th Cir.1986) (emphasis added). *See also Wilson v. Robinson,* 668 F.2d 380, 384 (8th Cir.1981), *overruled on other grounds, Stow v. Cochran,* 819 F.2d 864 (8th Cir. 1987) ("The ripeness doctrine functions to ensure that issues are presented with the clarity and concreteness that accompanies the threat of actual harm or loss."). Because the NKCSD plan is merely in its planning stages, this court cannot speculate as to whether the conditions listed in the proposal discriminate against black students from the KCMSD.

█ Plaintiffs' argument that the nonresident policies were used as a pretext to deny plaintiffs' admission is no more persuasive. Plaintiffs argue that the fact that several SSDs accept white, nonresident, "special education" students is further proof that they intend to discriminate against black KCMSD students who seek the benefits of a different type of special program, an integrated education.

This argument is simply without merit. First, plaintiffs have failed to establish any evidence that black students are treated any differently than white students under any aspect of the SSDs' respective nonresident plans nor have they established that blacks are excluded from the SSDs' special education program, a factor that would certainly be probative on the issue of intent. In addition, the evidence in the record clearly establishes that white nonresident students in the same position as plaintiffs would also have been denied admission to the SSDs. *See Tasby v. Estes,* 412 F.Supp. 1185 (N.D.Texas 1975), *aff'd,* 572 F.2d 1010 (5th Cir.1978), *cert. granted sub nom.,*

*Estes v. Metropolitan Branches of Dallas NAACP,* 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979), *cert. dismissed,* 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980) (nonresident policy of school district that resulted in whites, but not blacks, being allowed to transfer into suburban school district "had de minimus to no effect upon the racial composition of the [Dallas Independent School District]" and, therefore, no constitutional violation was found). More importantly, however, the SSDs have the right to decide whether they wish to participate in a voluntary interdistrict transfer program. To rule otherwise would emasculate the meaning of the word "voluntary."

The Supreme Court has consistently stated that it will not interfere with local control over education programs absent a showing that the discretion of local school officials is being used in an unconstitutional manner. *See, e.g., Martinez v. Bynum,* 461 U.S. 321, 329, 103 S.Ct. 1838, 1943, 75 L.Ed.2d 879 (1983) (local school boards have the right to impose residence requirements because "provision of primary and secondary education ... is one of the most important functions of local governments"); *Washington v. Seattle School District No. 1,* 458 U.S. 457, 482, 102 S.Ct. 3187, 3201, 73 L.Ed.2d 896 (1982) ("If local school boards operating under a similar statutory structure are considered separate entities for purposes of constitutional adjudication when they made segregative assignment decisions, it is difficult to see why a different analysis should apply when a local board's *desegregative* policy is at issue.") (emphasis in original); *Milliken,* 418 U.S. at 741–42, 94 S.Ct. at 3125–26 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process.").

Plaintiffs in the instant case have not shown even the slightest indication that the SSDs were improperly exercising discretion in refusing to admit plaintiffs as nonresident students. Indeed, the opposite is

more likely to be true since at least two of the three districts were actually developing VIT programs at the time plaintiffs attempted to gain admission to the SSDs. Thus, considering the historical involvement of the SSDs in the *Jenkins* litigation and the fact that the SSDs were working with the state to develop VIT programs, both of which are factors this court must consider under *Arlington Heights,* no finding of discriminatory intent is possible.

## VI. *The State Defendants*

In their motion to dismiss or, in the alternative, for judgment on the pleadings, the state defendants argue that they have not committed any acts of discrimination since they did not deny the plaintiffs' applications to the SSDs. In addition, the state defendants argue that they have no obligation to fund the transfers proposed by plaintiffs since Judge Clark's order in *Jenkins* directed the state, and not the plaintiffs, to implement VIT programs.[18] Plaintiffs have filed a motion for partial summary judgment against the state defendants on the issue of the state's duty to pay the transportation and tuition costs of any KCMSD student given permission to enroll as a nonresident student at one of the defendant SSDs. Thus, the court will treat the issue of the state's duty to fund the programs as arising under cross motions for summary judgment.

Plaintiffs argue that the state defendants have violated their constitutional rights because they have failed to take affirmative steps, as ordered by Judge Clark in *Jenkins,* to remedy earlier constitutional violations. *See Reitman v. Mulkey,* 387 U.S. 369, 375, 87 S.Ct. 1627, 1631, 18 L.Ed.2d 830 (1967) ("prohibited state involvement could be found 'even where the state can be charged with only encouraging,' rather than commanding discrimination") (citation not given). More specifically, plaintiffs argue that by failing to fund the transportation and tuition costs of

plaintiffs who are accepted as nonresident students at one of the three defendant SSDs, the state defendants have abrogated their duty under Judge Clark's remedy order in *Jenkins* and, therefore, committed a new constitutional violation.

■ Like the constitutionality of the preliminary proposals discussed earlier, the issue of the state's duty to fund the plaintiffs' plan is not a "case or controversy" as required by Article III. As plaintiffs themselves admit, Judge Clark determined in *Jenkins* that the state has a duty to fund the education of "any and all KCMSD black school children who desire to attend school in the suburban school districts *and are admitted* by those districts in a racially nondiscriminatory manner." Plaintiffs' Opposition at 6 (emphasis added). Thus, even if the case were ripe for review the issue is moot since no students were admitted to any of the three defendant SSDs for the 1988–89 school year.

■ Furthermore, this court does not have jurisdiction to decide whether the state of Missouri has a duty to fund a voluntary interdistrict program suggested by plaintiffs. The requirement that the state funds VIT programs stems directly from Judge Clark's remedial order and it is Judge Clark, not this court, who must determine whether a particular program falls within the scope of his remedy order.[19]

Plaintiffs have not, however, proven any new violation by the state of Missouri. Their main allegation appears to be that the state has not acted with due diligence in establishing voluntary interdistrict transfer programs. While the fact that the state has not yet successfully established a VIT program may be indicative of discriminatory intent, it is only one factor the court must consider. Although no program has yet been established, the state has been working with the school districts to establish such a program. Judge Clark addressed this issue in his January 7, 1988

---

**18.** *See supra* at n. 3.

**19.** *See supra* at n. 3. This is not to say, however, that this court has no jurisdiction over the state in the present case, as argued by plaintiffs in their earlier motion to transfer. Insofar as plaintiffs allege that some new violation by the state occurred during the time period giving rise to the facts of this case, this court does have jurisdiction.

order, which addressed the plaintiffs' argument that the state defendants were not seriously committed to arranging a VIT plan in accordance with the *Jenkins* remedy order. In that order

[t]he Court acknowledge[d] that progress in achieving a voluntary interdistrict program has been slow, but [found] that it is *not because of a lack of effort by the state defendants.* On the contrary, the State contends that it has engaged and is currently engaged in discussions with the school districts in the Kansas City, Missouri area. Furthermore, the newly created voluntary interdistrict transfer subcommittee of the Desegregation Monitoring Committee is fully committed to assisting the State and the other parties in developing a voluntary interdistrict transfer program. The court [found] that this subcommittee, not an order from the court is the most effective means in achieving a successful voluntary interdistrict transfer program. Therefore, the plaintiffs' motion to require the State of Missouri to engage in further efforts and activities towards achieving a voluntary interdistrict program will be denied.

*Jenkins,* January 7, 1988 Order at 14–15 (emphasis added).

 This court believes that Judge Clark's determination that the state is actively engaging in efforts to establish a voluntary interdistrict transfer program is compelling, if not binding, evidence that the plaintiffs have failed to establish a genuine issue as to whether the state has discriminated against plaintiffs by frustrating the establishment of VIT programs. While the state has questioned its responsibility to finance the tuition and transportation of students in a program proposed by plaintiffs, rather than coordinated by the state, the court cannot find that such a challenge is evidence of discrimination against plaintiffs in the present case. The state has a right to challenge its interpretation of Judge Clark's remedy order in *Jenkins* and has done so. This challenge, without more, does not prove discriminatory intent.

## VII. *Sanctions*

The defendant school districts have filed a motion for sanctions under Fed.R.Civ.P. 11. This motion is joined by the state defendants.[20] Each of the defendants asks that plaintiffs be required to pay for all costs [21] incurred in defending this suit for two reasons: (1) because plaintiffs refiled their motion to transfer the case to Judge Clark in this court after Judge Bartlett had denied an identical motion only a few days earlier and (2) because plaintiffs' motion for a preliminary injunction must be considered as frivolous in view of the fact that plaintiffs' attorney stated in a hearing before Judge Bartlett that the plaintiffs would dismiss their case if they were not awarded relief before September 6, 1988, the beginning of the school year.

Fed.R.Civ.P. 11 requires that all pleadings be signed by an attorney or by the party if the party is proceeding *pro se.* This signature

constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion

---

**20.** The state defendants orally joined in this motion at the hearing on August 18, 1988. Transcript of August 18, 1988 Hearing at 31. The state did not, however, file a written motion for sanctions.

**21.** The SSD defendants' motion actually seeks a variety of sanctions, including dismissal of the

case. In view of the fact that the court has granted defendants' various motions for summary judgment, it need not consider dismissal as a possible sanction under Rule 11. As a result, the court's discussion of the Rule 11 issue will consider only defendants' requests for costs and attorneys' fees.

or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11. Thus, defendants in the present case argue that plaintiffs should not have filed the lawsuit itself, but especially the second motion to transfer and the motion for a preliminary injunction, because these pleadings were not well grounded in fact or by existing law and they were filed in order to harass the suburban school districts which were, at the time the lawsuit was filed, preparing for the start of the 1988–89 school year.

In determining whether an award of sanctions is appropriate in the instant case this court must consider "whether the person who signed the pleading conducted a reasonable inquiry into the facts and law supporting the pleading." *O'Connell v. Champion International Corp.*, 812 F.2d 393, 395 (8th Cir.1987). *Accord Thomas v. Capital Security Services*, 836 F.2d 866, 873 (5th Cir.1988) ("Rule 11 compliance is now measured by an objective, not subjective, standard of reasonableness under the circumstances."); *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 124 (8th Cir. 1987) (the determination of whether an attorney made a reasonable inquiry into the facts of a case before signing the paper or pleading is based on objective reasonableness); *Unioil, Inc. v. E.F. Hutton & Co., Inc.*, 809 F.2d 548, 557 (9th Cir.1986), *cert. denied sub nom., Barton v. E.F. Hutton & Co., Inc.*, — U.S. ——, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987) (Rule 11 violations are not determined by evaluating subjective bad faith but "[r]ather an attorney violates Rule 11 whenever he signs a pleading, mo-

tion, or other paper without having conducted a *reasonable inquiry* into whether his paper is frivolous, legally unreasonable, or without factual foundation.") (emphasis in original).

■ This court must focus upon the time when plaintiffs filed their lawsuit and cannot use hindsight to determine whether there was a reasonable basis for the suit or whether it was brought to harass defendants. *Thomas*, 836 F.2d at 874. *See also Burull v. First National Bank of Minneapolis*, 831 F.2d 788, 789 (8th Cir.1987), *cert. denied sub nom., Arthur Young & Co. v. Burull*, — U.S. ——, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988) ("Rule 11 directs sanctions 'only when the "pleading, motion or other paper" itself is frivolous, not when one of the arguments in support of a pleading or motion is frivolous.'") (quoting *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1540 (9th Cir.1986)); *Fisher v. CPC International, Inc.*, 591 F.Supp. 228, 237 (W.D.Mo. 1984) (Rule 11 sanctions are appropriate when "action had no reasonable basis in law or fact from the beginning."). Although it is helpful for a party or the court to identify specific pleadings which they find to be the subject of Rule 11 sanctions, there is no absolute requirement that specific papers be identified if the conduct of the litigation as a whole is appropriate for sanctions. *Lupo v. R. Rowland & Co.*, 857 F.2d 482, 485–86 (8th Cir.1988).

■ The court finds that Rule 11 sanctions are appropriate in this case.[22] First, the court notes that plaintiffs filed a motion to transfer the case to Judge Clark after Judge Bartlett recused himself and the case was transferred to this division. This motion was identical to one denied by Judge Bartlett only days before. Plaintiffs presented no new facts or evidence in sup-

---

22. The court notes that an award of fees may also be appropriate under 28 U.S.C. § 1927 which provides that

any attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the

excess costs, expenses, and attorney's fees reasonably incurred because of such conduct. As this decision notes, *infra*, the timing of the motion for preliminary injunction, and the statements of plaintiff's counsel to Judge Bartlett, appear to be the type of conduct to which section 1927 is directed.

port of the motion for transfer but, apparently, were attempting to circumvent Judge Bartlett's ruling and appear before a judge who they believed might be more favorable to their cause. Thus, this court will direct plaintiffs' attorney to pay the costs incurred by defendants in responding to the second motion to transfer.

The decision whether to assess costs against plaintiffs' attorney for filing the lawsuit generally, and the motion for a preliminary injunction specifically, is more difficult. After a careful consideration of the facts, the court finds that plaintiffs' attorney should be required to pay defendants' costs in preparing for the preliminary injunction hearing and in defending against the lawsuit generally. While the court acknowledges that footnote 30 of the Eighth Circuit's decision in *Jenkins* opened the door to plaintiffs' suit, plaintiffs have not presented any evidence to suggest that this specific lawsuit had any basis in fact or in law. Plaintiffs began communication with the SSDs in May 1988 regarding the possibility of plaintiffs enrolling in the defendant SSDs for the 1988–89 school year. Defendants' attorneys responded to each of the letters written to them by plaintiffs' counsel,[23] and told plaintiffs' attorney that the districts were considering voluntary interdistrict transfers but had not yet reached any definite conclusions about whether to participate in a program.[24] Thus, well before plaintiffs filed suit in the instant case they were aware that the suburban school districts were considering, and in some cases formulating, voluntary interdistrict transfer plans. Evidence of consideration of these plans should have been considered by plaintiffs' attorney before he filed suit alleging that defendants were intentionally discriminating against plaintiffs. Similarly, plaintiffs' attorney should not have filed suit merely because he believed drafts of proposed plans were constitutionally infirm.

The court is also persuaded by defendants' argument that plaintiffs' counsel, when appearing before Judge Bartlett to determine a date for the preliminary injunction hearing, unequivocally stated that plaintiffs would be inclined to dismiss the case if a permanent injunction was not issued during the beginning of September.[25] The court finds it incongruous that

23. In some cases, letters were written by members of the KCMSD school board to members of the school boards of the SSDs.

24. For example, on May 27, 1988 George Feldmiller, attorney for the defendant SSDs, wrote a letter to Arthur Benson, plaintiffs' attorney, stating that

"the districts are quite busy now with end-of-year school matters. Nevertheless, the districts will discuss the overall subject over the next few weeks. I believe at least one of the districts has some investigation activities scheduled for mid-July." On June 20, 1988 Feldmiller responded to Benson's June 16, 1988 letter soliciting suggestions about the process for instituting a voluntary interdistrict transfer plan. In this letter Feldmiller stated that "none of the districts has made a final decision whether to permit enrollment of such students or the qualifications which would be required if any district decides to accept such applicants. Each of the districts is currently giving every consideration to a voluntary program."

In addition, letters from Feldmiller to Dr. Terry Stewart, the coordinator of the State Department of Elementary and Secondary Education, illustrate that both the NKCSD and the ISD were in the process of formulating proposals for the 1989–90 school year. *See* July 19, 1988

letter to Dr. Terry Stewart from George Feldmiller and July 22, 1988 letter from Norman Humphrey, Jr. to Mr. Terry Stewart.

25. The relevant portion of the transcript states:

THE COURT: Well, I didn't really take him literally on that, Mr. May. Maybe I should have, but I gave him the benefit of the doubt that he was, that was the relief he wants, but if he would end up getting relief for, at some later date, I don't think he would probably turn it down. Am I wrong, Mr. Benson?

MR. BENSON: Well, you may be. I could foresee a situation in which, if a preliminary injunction were entered and it were taken to the 8th Circuit by the defendants and a decision was not rendered until the 8th of September, then I am not literally drawing an imaginal line of the 6th of September, but *there is a date very soon in September where the relief would not be appropriate. My clients would not want the relief at that time.*

It would do them—it would be counter-productive to their education to be admitted at some significant period of time into the school year. And it would be disruptive to the schools in a way that will affect their education. So there is a date very soon after the [sic] September 6th that would moot their request for relief. It is a date that is close

plaintiffs would request both a preliminary and permanent injunction and then state, on the record, that they would dismiss their suit entirely if the two hearings were not consolidated because they wanted the relief within two or three weeks of the time the suit was filed or not at all. The court is especially suspect of this procedural posturing given the fact that plaintiffs decided to withdraw their motion for a preliminary injunction only an hour before the hearing was scheduled to begin.

At the time plaintiffs withdrew their motion for a preliminary injunction they did not offer to dismiss the rest of the case, but rather, asked that the court simply consider the motion for a permanent injunction at a later date, after additional discovery had taken place.[26] At the hearing held on August 18 in place of the preliminary injunction hearing, Benson stated that he had a "full understanding" the court could not schedule a permanent injunction hearing "anytime soon." Transcript of August 18, 1988 Hearing at 46. Not only does the court find that these statements are inconsistent, it also cannot help but wonder whether counsel made these deci-

> enough so that I can conceive no circumstances under which we would want to have a hearing for a permanent injunction at some later time. I can see no reason not to consolidate the two.
>
> THE COURT: I can't believe you are taking that position. Are you taking the position that if, for one reason or another, I would determine that you don't get a preliminary injunction but at some later hearing I would determine you are entitled to the relief you request but beginning in the next school year, you would dismiss this case rather than seek that?
>
> MR. BENSON: Well, no, because *we are not asking for relief in the next school year.*
>
> THE COURT: I know you are not asking for relief in the next school year. I think I know what you are trying to do. You are trying to make this a clear cut irreparable harm matter. I think you better rethink that. I think you are jeopardizing the interest of your clients. You didn't bring this case, Mr. Benson, until August at [sic] 10th.
>
> MR. BENSON: They didn't—Your Honor, they didn't turn us down until the end of July.
>
> THE COURT: If they were doing what you suggest they were doing, it seems to me you knew about it earlier. But—in any event, if that is your position, I will take you literally and will reflect on this record that if relief is not afforded your clients to enter school by September the 6th *that the case can be dismissed because you don't want any other ruling;* is that correct?
>
> MR. BENSON: *That is very close to what I am saying, Your Honor.*
>
> THE COURT: Okay, that is what it will reflect.
>
> MR. BENSON: I am saying—
>
> THE COURT: I will take you literally.
>
> MR. BENSON: Your Honor, I am saying because we want this litigation concluded as badly as the defendants do at an earlier date, if we are not entitled under either of our theories to have our kids put in these schools, then we need to find, we have to address the question of their opportunities for an integrat-
>
> ed education in some other manner. It serves us all to put this litigation behind us. That is why we want to have the permanent injunction heard at the same time with the preliminary injunction. We are prepared to do that.
>
> THE COURT: It seems to me you are putting the cart before the horse. You are putting some kind of idea about accelerated litigation ahead of the long-term interests of your clients. But that is up to you. You represent them, I don't, and I will take you literally at what you say; if you don't get the relief that you request in this court, this case will be dismissed. And it will be dismissed if you don't get the admission by September 6th, it will be dismissed. I just don't understand that.
>
> MR. BENSON: As I said, I am not drawing a literally imaginal line on September 6th. But if there were circumstances to which the decision of the court was delayed and it came out on the 7th—that is not what I am saying, if that is what the court is interpreting.
>
> THE COURT: That is not what I am saying. I am saying, you don't want relief if you don't get it on September 6th, 7th, 8th or 9th, you don't want relief.
>
> MR. BENSON: To be absolutely positive in the statement and declaratory, *we are not asking for relief in the second semester of the coming school year or the subsequent school year.* That is not part of the lawsuit or part of the relief. *We would dismiss, if that were the only alternative.*
>
> Transcript of August 12, 1988 hearing at 53–56 (emphasis added).

**26.** In the August 18 hearing before this court Benson argued that his comments before Judge Bartlett were made because "[t]he only thing we wanted was a conjunction of the permanent injunction and preliminary injunction hearings at the same time...." Transcript August 18, 1988 Hearing at 14. Even a cursory reading of the August 12 transcript belies this assertion since Benson stated, on several occasions, that his clients wanted no relief after the beginning of the school year.

sions with the best interests of his clients in mind. As a result, the court will order plaintiffs' attorney to pay the reasonable costs incurred by defendants in preparing for the preliminary injunction hearing and in preparing their dispositive motions. Defendants' attorneys are directed to file affidavits listing costs accrued and hours spent, along with the applicable hourly rates, defending against this case. Plaintiffs will then be given an opportunity to respond to these affidavits. Accordingly, it is

ORDERED that the motion of Lee's Summit Revised School District for summary judgment is granted. It is further

ORDERED that the motion of Lee's Summit Revised School District for dismissal is denied as moot. It is further

ORDERED that the motion of the North Kansas City School District for summary judgment is granted. It is further

ORDERED that the motion of the Independence School District for summary judgment is granted. It is further

ORDERED that the alternative motion of the Independence School District to dismiss is denied as moot. It is further

ORDERED that the motion for summary judgment by the state defendants is granted. It is further

ORDERED that the plaintiffs' motion for partial summary judgment against the state defendants is denied. It is further

ORDERED that defendants' motion for sanctions pursuant to Rule 11 is granted. It is further

ORDERED that defendants file affidavits detailing their costs and the hours spent defending this suit within twenty days of the date of this order. It is further

ORDERED that plaintiffs respond to defendants' affidavits within twenty days of their file-stamp date.