904 F.2d 415
 60 Ed. Law Rep. 1090
 Kalima JENKINS, by her friend, Kamau AGYEI; Carolyn Dawson,
by her next friend, Richard Dawson; Tufanza A. Byrd, by her
next friend, Teresa Byrd; Derek A. Dydell, by his next
friend, Maurice Dydell; Terrance Cason, by his next friend,
Antoria Cason; Jonathan Wiggins, by his next friend
Rosemary Jacobs Love; Kirk Allen Ward, by his next friend,
Mary Ward; Robert M. Hall, by his next friend, Denise Hall;
Dwayne A. Turrentine, by his next friend Sheila Turrentine;
Gregory A. Pugh, by his next friend, David Winters, on
behalf of themselves and all others similarly situated; Appellants,
American Federation of Teachers, Local 691, Appellee,
v.
The STATE OF MISSOURI; Honorable John Ashcroft, Governor of
the State of Missouri; Wendell Bailey, Treasurer of the
State of Missouri; Missouri State Board of Education;
Roseann Bentley, Dan Blackwell, Terry A. Bond, President,
Roger L. Tolliver, Raymond McCallister, Jr., Susan D. Finke,
Thomas R. Davis, Cynthia B. Thompson, Members of the
Missouri State Board of Education; Robert E. Bartman,
Commissioner of Education of the State of Missouri, Appellees,
and
School District of Kansas City, Missouri and Claude C.
Perkins, Superintendent thereof, Appellees.
Jennifer T. NAYLOR and Eric J. Naylor, by their next friend
Reverend James NAYLOR; Dwayne Shores, by his mother and
next friend Rose Shores; Adrian R. Dean, Tanisha M.
Johnson, Andrea L. Johnson, and Gregory T. Johnson, by their
mother and next friend Patience M. Johnson; Kevin Dion
Innis, by his mother and next friend Linda Innis; Deidra
Jovan Rayfield, by her mother and next friend Latricia
Rayfield McArn; Nicole R. Griffith, by her father and next
friend Raymond B. Griffith, Sr.; Chrissean King, by his
mother and next friend Patti King; Ronale M. Dunn, by his
mother and next friend Janice Dunn; LaShonda M. Gross, by
her father and next friend Michael L. Gross; Jerry Steve
Roggett, by his grandmother and next friend, Martha M.
Anderson; and Bryant Tucker, by his mother and next friend
Gladys Tucker, Appellants,
Arthur A. Benson, II, Appellant,
v.
LEE'S SUMMIT REORGANIZED SCHOOL DISTRICT R-7; Dr. Gail
Williams, Acting Superintendent thereof; and Robert Jones,
Robert Bruce, James Coleman, John Patterson, Margaret
Piepergerdes, Sherry Sims, Members of the Board of Education
thereof; North Kansas City, Missouri School District; Dr.
Gene Denisar, Superintendent thereof; and Freddie Nichols,
Rick Moore, Sandra Clark, Mary Smith, Bill Trickey, Joe
Jacobs, Wes McCullough, Members of the Board of Education
thereof; School District of the City of Independence; Dr.
Robert Henley, Superintendent thereof; and Sharon Williams,
Helen French, Michael Barnett, Ronald Sinke, Sharon Floyd,
Phillip Parrino, Members of the Board of Education thereof;
The State of Missouri; John Ashcroft, Governor of the State
of Missouri; Wendell Bailey, Treasurer of the State of
Missouri; Robert Bartman, Commissioner of Education of the
State of Missouri; and Roseann Bentley, Dan Blackwell,
Pres. Terry A. Bond, Delmar A. Cobble, Grover Gamm, Jimmy
Robertson, Robert L. Welling, Donald E. West, Members of the
Missouri State Board of Education, Appellees.
 Nos. 89-1957, 89-2452.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 21, 1990.
Decided May 23, 1990.
Order on Denial of Rehearing
and Rehearing En Banc
May 23, 1990.
 
 Arthur A. Benson, II, Kansas City, Mo., and Patricia A. Brannan, Washington, D.C., for appellants.
 Michael J. Fields, Jefferson City, Mo., for appellees.
 Bertrand M. Cooper, Seth Aronson, Scott J. Kaplan, O'Melveny & Myers Los Angeles, Cal., for appellant Arthur A. Benson II.
 Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 We are concerned in these consolidated appeals with the following questions: (1) did the district court err in granting summary judgment to the North Kansas City School District, Lee's Summit Reorganized School District R-7, and the Independence School District; (2) did the district court err in granting summary judgment to the State of Missouri; and (3) did the district court err in imposing sanctions of $83,761.59 on appellants' attorney, Arthur A. Benson II. We answer all three questions in the affirmative and remand to the district court with directions that it promulgate a voluntary interdistrict transfer plan. This plan will require the State of Missouri to pay transportation and tuition costs for a limited number of black students residing in the Kansas City, Missouri School District who desire to attend suburban schools and who are accepted pursuant to the plan.
 
 BACKGROUND
 
 2
 On June 14, 1985, Judge Russell Clark entered an order desegregating the Kansas City, Missouri School District (KCMSD). Jenkins v. Missouri, 639 F.Supp. 19 (W.D.Mo.1985), aff'd, 807 F.2d 657 (8th Cir.1986), cert. denied sub nom. Kansas City, Missouri School Dist. v. Missouri, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). An integral provision of the order required the State of Missouri to actively seek the cooperation of each suburban school district in the Kansas City area in a voluntary interdistrict transfer (VIT) program. The order required the State to pay for the transportation and tuition of black students who transfer from a school within the KCMSD in which their race is in the majority, with preference to students from schools with 90% or more black students, to a suburban school where space is available and in which their race is in the minority. The order required that the State continue to pay the KCMSD the full student foundation allotment for each student who transfers from that district to a suburban school. Id. at 39.
 
 
 3
 The order provided that a receiving district must: (1) agree not to reject individual applicants unless there is a history of serious discipline problems; (2) allow the transfer students to remain in attendance until such student graduates or returns to the student's home district as long as that student satisfies all academic and other standards applicable to resident students; (3) treat transfer students in the same manner as it treats resident students; and (4) permit the KCMSD to recruit within its district applicants for interdistrict transfers. The order also required the State of Missouri to provide a full-time counselor for every 100 students who transfer from the KCMSD to a suburban school district. Id.
 
 
 4
 This order providing for VITs, a component of the district court's comprehensive desegregation plan, was appealed to this Court. On December 5, 1986, we affirmed. Jenkins v. Missouri, 807 F.2d 657, 686 (8th Cir.1986), cert. denied sub nom. Kansas City, Missouri School Dist. v. Missouri, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). We held that while the facts did not justify a compulsory interdistrict remedy, the interdistrict transfer plan ordered by the district court was constitutionally justified.[1]
 
 In footnote 30 of that opinion, we stated:
 
 5
 A voluntary interdistrict program is one that has great potential for improving the racial balance in the Kansas City area. The experience in St. Louis with such a plan seems to have been favorable. The district court is correct in its holding that such a program cannot be mandatorily imposed upon the record before the court. Whether a refusal of a district to participate in such a voluntary program may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation is an issue that we should not anticipate.
 
 
 6
 Id. at 683 n. 30. Judge Ross wrote separately to emphasize the importance of this admonition. He stated:
 
 
 7
 At the time of argument it was my understanding that a voluntary interdistrict program, patterned along the lines of the St. Louis program was a real possibility. It would now appear that some of the districts are not moving forward with this plan.
 
 
 8
 In my opinion the failure to organize and implement this program would be a very significant factor in determining discriminatory intent in the future litigation which is certain to result from the further processing of this case. The St. Louis program would be a useful model for the actions to be taken by all the Missouri districts which are parties to this action.
 
 Id. at 687 (Ross, J., concurring).[2]
 I. Claims of Naylor Plaintiffs
 
 9
 In the summer of 1988, 134 black students applied for admission into three suburban school districts, North Kansas City, Lee's Summit, and Independence. They were denied admission. Arthur Benson, acting as counsel for the students who had been rejected, commenced an action asserting that these students had been denied admission because of their race and asking the court to order the school districts to admit them, and to order the State to pay their transportation and tuition costs. The case was initially assigned to Judge D. Brook Bartlett of the Western District of Missouri. Benson made application to transfer the case to Judge Russell Clark, who retained responsibility for the Jenkins case. That motion was denied. After Judge Bartlett recused himself, the case was reassigned to Judge Joseph E. Stevens, Jr. Benson made a second motion for transfer, which was also denied. On January 11, 1989, Judge Stevens granted summary judgment in favor of the State and the three school districts.
 
 
 10
 Judge Stevens reasoned that the conditions which the suburban school districts set forth in denying the black students' transfer applications were prospective only, and were suggested components of voluntary interdistrict transfer plans that had not yet been finalized or approved. He held that the black students were denied admission for the 1988-89 school year only because they failed to meet the suburban districts' existing requirements for nonresident transfers. Consequently, Judge Stevens concluded that the black students' challenge to the proposed conditions for voluntary interdistrict transfers was not yet ripe.
 
 
 11
 Judge Stevens finally concluded that because none of the black students had been admitted to the suburban districts for the 1988-89 school year, the State had not violated its obligation under the June 14, 1985 order by refusing to pay their tuition and transportation costs. Plaintiffs appeal from the district court's entry of summary judgment.[3] We reverse because a material factual dispute remains respecting the suburban school districts' racial motivation in refusing to accept black transfer students from the KCMSD.
 
 
 12
 While the record is replete with allegations, affidavits, counter-affidavits, and letters between the parties bearing on the question whether the suburban school districts' refusal to accept the black students was racially motivated, one thing is clear from the record. Since June 14, 1985, not a single suburban school district has admitted a single black student from the KCMSD pursuant to a plan negotiated by the State and the suburban school districts. While there may be many reasons contributing to this failure, it seems clear to us that a very important one is the State's refusal to pay transportation costs and tuition for students until a VIT plan has been negotiated with the suburban districts and approved by the district court. Meanwhile, no suburban district is willing to accept any transfer student until it is assured that it will receive State funding. Although we cannot say with certainty that the State and the suburban school districts would never agree to a VIT plan on their own, after five years, we believe that further delay cannot be countenanced. The time has come for the district court itself to formulate and implement a plan. We therefore remand to the district court with directions to reassign the Naylor case to Judge Russell Clark, the judge currently responsible for the Jenkins litigation.
 
 
 13
 In No. 89-1957, Jenkins v. Missouri, the plaintiff class appeals from the district court's determination that the question of funding voluntary interdistrict transfers was not ripe. We disagree with this decision and believe that it should be vacated, and the case remanded for further proceedings consistent with this opinion.
 
 
 14
 Resolution of the issues presented in Jenkins v. Missouri requires that the district court, after giving the parties an opportunity to suggest proposals, promptly develop a voluntary interdistrict transfer program to implement the remedy called for in its opinion of July 14, 1985, which we affirmed. Jenkins, 807 F.2d at 682-84, 712. The essentials of the plan should be generally consistent with those originally set forth in the opinion of June 14, 1985, as modified and affirmed by this Court. Additionally, the district court may find guidance in development of such a plan in the several decisions of this Court in Liddell v. Missouri, 731 F.2d 1294, 1302 (8th Cir.) (en banc), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984); see also Liddell v. Board of Education, 567 F.Supp. 1037, 1055 (E.D.Mo.1983); Liddell v. Board of Education, 873 F.2d 191, 193-94 (8th Cir.1989). It is to be hoped that the district court can develop a program so that school districts which desire to do so may participate in the 1990-91 school year.[4]
 
 
 15
 Any statements submitted to the district court by the plaintiffs, the Jenkins class, the State, the suburban school districts, or others as to the contents of the voluntary interdistrict transfer program may not be used as evidence of racial animus in any future proceedings.
 
 
 16
 For reasons already given in this opinion, we are also remanding for further proceedings before Judge Clark, the Naylor case, in which we have held a genuine issue of material fact exists as to the racial motivation of appellees' refusal to accept black transfer students from KCMSD. The district court should consider whether this litigation should be stayed pending the formulation of the voluntary interdistrict transfer program, and a decision by the suburban school districts as to whether to participate in it. This decision we leave to the district court's discretion.
 
 
 17
 In Naylor, the summary judgment for the defendants is reversed, and the cause is remanded for further proceedings consistent with this opinion. In Jenkins, the decision of the district court denying the motion of the Jenkins class for implementation of the voluntary interdistrict plan is likewise reversed, and the cause remanded for further proceedings consistent with this opinion.
 
 II. Sanctions
 
 18
 Judge Stevens imposed sanctions of $83,761.59 on Benson, appellants' attorney, after entering summary judgment in favor of all defendants. Judge Stevens sanctioned Benson because plaintiffs' claim that the suburban school districts treated black transfer applicants differently from white transfer applicants was frivolous, because Benson withdrew a motion for a preliminary injunction after asserting that plaintiffs would be satisfied only with immediate relief, and because Benson filed a second motion to transfer the case to Judge Clark after his first such motion had been denied.
 
 
 19
 We apply a three-pronged review to a district court's award of Rule 11 sanctions. E.E.O.C. v. Milavetz & Assocs., P.A., 863 F.2d 613, 614 (8th Cir.1988). Factual findings supporting the sanctions are reversed only if clearly erroneous, the legal conclusion that Rule 11 has been violated is reviewed de novo, and the appropriateness of the sanction is reviewed for abuse of discretion. Id.
 
 
 20
 Judge Stevens found frivolous that portion of plaintiffs' complaint alleging that the suburban school districts treated black transfer applicants differently from their white counterparts.[5] In our view, this allegation is not so frivolous as to warrant Rule 11 sanctions. Plaintiffs presented letters written by the school districts to parents of the unsuccessful transfer applicants containing proposed conditions for transfers clearly tied to the ongoing Kansas City school desegregation litigation. These conditions could not be applied to white transfer applicants who were not parties to the desegregation litigation. Additionally, we do not believe plaintiffs' complaint is as easily divided into two separate claims, one frivolous and one not, as Judge Stevens concluded it was.
 
 
 21
 The plaintiffs' allegations arose out of a single set of facts, the suburban school districts' denial of their transfer applications. Plaintiffs filed their suit in August 1988, shortly after their applications were denied, and sought relief to take effect for the 1988-89 school year. In view of the limited time in which Benson had to act, we believe that the complaint he filed on plaintiffs' behalf was, to the best of his knowledge after a reasonable investigation, well grounded in fact and warranted by a good faith argument for the extension or modification of existing law. See Fed.R.Civ.P. 11; see also id. advisory committee note (what constitutes a reasonable inquiry may depend on the amount of time for investigation available to the signer).
 
 
 22
 Judge Stevens also based the sanction award on Benson's second motion to transfer the case to Judge Clark. In our view, the Naylor plaintiffs' claims are inextricably involved with the Jenkins litigation and this case should have been assigned to Judge Clark in the first place. We believe Benson's motions to transfer were not intended to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation, but were instead intended to place identical issues before a single decision maker. Accordingly, we vacate the order of the district court imposing sanctions on Benson.
 
 CONCLUSION
 
 23
 In conclusion, we repeat what we have said before. The interests of the students of the KCMSD and the suburban districts will be well served if all the parties see fit to participate in the VIT plan to be promulgated by the district court.
 
 
 24
 JOHN R. GIBSON, Circuit Judge, concurring.
 
 
 25
 I concur in the court's opinion and write separately only to explain more completely my reasons for concluding that the rulings of the district court should be reversed.
 
 
 26
 This case demonstrates the difficulty of determining complex cases involving school desegregation, and the attendant issues of discriminatory intent, by summary judgment. Text writers have discussed the inapplicability of summary judgment in such cases.[6] This is just such a case involving the question whether there was discriminatory intent on the part of three suburban school districts, which necessarily involves an analysis of the actions, practices, decisions, and policies of school boards and of those delegated to assist the boards in carrying out their responsibilities. This is not a case where a minimal record exists, since the record before the district court consisted of some 1,983 pages. Recent Supreme Court decisions amplifying the scope of summary judgment under Federal Rule of Civil Procedure 56 do not support the district court's grant of a summary judgment in this case. Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), makes it plain that drawing legitimate inferences from the facts is a function for the fact-finder and:
 
 
 27
 [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.
 
 
 28
 Id. at 255, 106 S.Ct. at 2513 (citations omitted).
 
 
 29
 Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), also underscores the necessity for genuine issues of material fact to defeat summary judgment. As Matsushita demonstrates, the substantive law in an area can limit the range of permissible inferences that can be drawn from a set of facts. See id. at 587-88, 106 S.Ct. at 1356.
 
 
 30
 The Supreme Court in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), made the following statements that must guide this court in determining whether there is an issue for trial:
 
 
 31
 Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action--whether it "bears more heavily on one race than another," Washington v. Davis, [426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976) ]--may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in Gomillion [v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) ] or Yick Wo [v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ], impact alone is not determinative, and the Court must look to other evidence.
 
 
 32
 The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
 
 
 33
 429 U.S. at 266-67, 97 S.Ct. at 564 (citations and footnotes omitted).
 
 
 34
 As the court's opinion today points out, four years have passed, no plan has been adopted, and not one black student has been voluntarily transferred from KCMSD to a suburban school district.[7] The record before the district court demonstrated that two of the districts, North Kansas City and Independence, had, over the last several years, declining enrollments which would indicate the availability of physical plant space. The record also reveals that in 1986 the Lee's Summit Schools had a 1.4 percent black enrollment and the Independence Schools had a 1.8 percent black enrollment, while the North Kansas City Schools' student body was: 1.7 percent black, 2.7 percent Hispanic, 1.2 percent Asian-Pacific, and .4 percent American Indian or Alaskan Native, for a total minority enrollment of 6 percent. (Jt.App. at 1163-65).[8]
 
 
 35
 The Naylor Class argues with some force that the district court's analysis unduly focused upon whether the suburban school districts' "nonresident policies had the foreseeable consequence" of preventing the plaintiff class from attending the suburban school districts based on their race, and failed to properly evaluate the practices of the suburban school districts in light of all the principles underscored in Arlington Heights. I am also convinced that the district court erred in viewing the actions of the suburban school districts as merely preliminary proposals which could not serve as the basis for a finding of invidious discrimination. The entire situation before us simply demonstrates that the suburban school districts and the State have failed to make any headway toward the development of voluntary interdistrict transfer plans, and that each utilizes the inaction of the other as an excuse for its refusal to act.
 
 
 36
 I am satisfied that a review of both the policies and practices of the individual suburban school districts demonstrates that there is a genuine issue of material fact concerning the question of discriminatory intent.
 
 
 37
 When Naylor Class members requested admission to the Independence School District, the district responded by stating that the children would be admitted only if: (1) the State agreed to build and turn over to the district a new elementary school; (2) the district was reimbursed for its expenses in the prior Jenkins litigation and indemnified against the cost of future litigation arising out of the transfer program; and (3) the Jenkins Class attorneys agreed to not represent the children with respect to the district. These conditions were all set forth in a July 22, 1988, letter to Dr. Terry Stewart, Coordinator for Administrative Services, of the State Department of Elementary and Secondary Education. (Jt.App. at 1143-45). Moreover, while the Independence School District had an official non-resident student policy authorizing admission of four categories of students, (Jt.App. at 1083), the district referred to only one of those categories, namely non-resident students whose parents owned real estate in Independence, in a letter to Dr. Stewart dated February 10, 1987, (Jt.App. at 1118-19). The evidence also disclosed that in the five school years between 1984 and 1989, the district had admitted 115 special education students, of whom 108 were white, three were black, and four were members of other minority groups. The district also admitted eight white students from the Drumm Farm, a residential institution for children. (Jt.App. at 1387). Those students were not within any of the categories described in the district's non-resident policy. The Naylor Class asks why the district strictly adhered to its non-resident policy to reject the black children while at the same time violating its policies in order to accept the predominantly white special education children. That question raises the issue of whether the Independence district has departed from normal procedures and created special conditions for the Naylor Class such as those referred to in Arlington Heights. I am satisfied that these are issues that preclude summary judgment.
 
 
 38
 Lee's Summit had maintained a policy allowing students not residing in Lee's Summit "to attend the district's schools upon payment of tuition as established by the Board." (Jt.App. at 1088). On July 27, 1988, the district wrote Dr. Stewart to inform the State of the district's decision to not accept the plaintiffs, because the State would not pay their tuition. (Jt.App. at 1151). When counsel for the Jenkins Class informed the district that the plaintiffs would fulfill reasonable tuition requirements that the district would determine, (Jt.App. at 1154-55), the district answered that the students were denied admission because they did not satisfy the district's admission policy and practice, which focused on residency and property ownerships. (Jt.App. at 991). Later, an affidavit from the former board president stated that the district's policy was to accept non-resident students only to the extent required by law or to allow students to continue where the family had moved out of the district. Again, the district's shifting rationale and its failure to follow its own expressed policy both implicate the principles in Arlington Heights and could create an inference of discriminatory motive.
 
 
 39
 The North Kansas City School District had a policy allowing the enrollment of non-residents in several specified categories.[9] When the request was made for transfer by members of the Naylor Class, the district wrote to the State and to the parents of the black children stating that the children would be admitted only if: the district retained sole and final authority to accept or reject applicants; the students' parents or guardians pledged to support the students' educational activities and to be immediately available for consultation with school officials; certain school districts in the State of Kansas also agreed to accept KCMSD students; the State, KCMSD, and the plaintiff class provided full and unqualified indemnity to the district; KCMSD and the plaintiff class agreed to not pursue future litigation against the district; the district was fully reimbursed for all of the district's fees, expenses, and costs from both the previous Jenkins litigation and its investigation of voluntary programs; and a set aside fund was placed under the district's control for a five-year period to partially insure the required indemnities. (Jt.App. at 1130-38). I am convinced that these conditions, particularly the reimbursement of the earlier Jenkins litigation expenses, could raise an inference of discriminatory intent, because they are imposed against only one group of transfer students: the group of black students seeking admission.
 
 
 40
 As part of the response to the motion for summary judgment, the class filed affidavits from two Professors of Sociology, Dr. Robert L. Crane of Columbia University's Teachers College, and Dr. Mary R. Jackman of the University of Michigan, both claiming to be knowledgeable in the area of racial attitudes. Both of them analyzed the letter from the North Kansas City School District and expressed opinions in detail that the letter demonstrated racially discriminatory intent. These opinions are further support for the conclusion that factual issues were presented.
 
 
 41
 The record also reveals that North Kansas City School District had accepted non-residents if it was able, and the student's home district was unable, to meet the applicant's educational needs and if tuition was paid by the home district. Those accepted were routinely white, coming from home districts that were nearly all white.
 
 
 42
 In view of our determination that we must remand the issues with respect to the three suburban school districts for further proceedings, and in view of our earlier orders requiring that the State take the lead in developing voluntary interdistrict transfer plans, I believe that we need say no more concerning the need for remand as to the State.
 
 
 43
 A few further words are in order concerning the refusal to transfer this case to Judge Clark, who has presided over the Jenkins litigation. Evidently when filed, the Naylor case was assigned to a different division under the procedures of the clerk's office. Motions to transfer or consolidate were then denied. The order of the district court, however, in ruling on Naylor, made numerous references to Judge Clark's participation in Jenkins. In that order, the court questioned whether the eleven criteria of the North Kansas City School District's letter would qualify as an appropriate voluntary transfer plan under Judge Clark's order in Jenkins. Naylor v. Lee's Summit Reorg. School Dist. R-7, 703 F.Supp. 803, 816 n. 17 (W.D.Mo.1989).[10] In considering the liability of the State, the district court referred to Judge Clark's order and held that it did not have jurisdiction to decide whether the State had a duty to fund a voluntary interdistrict plan, as these requirements stem from Judge Clark's remedial order, and it was for him to make this determination. Id. at 818. The court also acknowledged Judge Clark's role in formulating a voluntary plan as well as the right of the State to challenge its responsibility to finance tuition and transportation of students in such a plan, which it could not find to be evidence of discrimination against plaintiffs in the case before it. These references to the Jenkins litigation pending before Judge Clark and to the need for action by him in that case point to the interrelationship of the Naylor case with Jenkins and the desirability of determining all of the voluntary transfer issues in one court, that responsible for the Jenkins litigation.
 
 
 44
 Interestingly, the district court in Naylor pointed to the prematurity of the issues because the North Kansas City School District's proposal was not yet a final plan. That proposal was predicated upon the State's willingness to pay tuition for the transfer students. Lee's Summit refused to accept transfer students because of the State's refusal to pay tuition. The State argued successfully before Judge Clark that whether the State had to fund voluntary transfer plans was a moot question, because no plans existed. These circular rationalizations, with the suburban school districts refusing to adopt a plan because the State has not made funds available, and the State arguing that there is no voluntary plan for it to fund, make the remand to fashion a voluntary plan essential. It also underscores the desirability of a stay of further litigation in Naylor.
 
 
 45
 ORDER DENYING PETITION FOR REHEARING AND SUGGESTION FOR
 
 REHEARING EN BANC
 
 46
 The suggestion for rehearing en banc has been considered by the court and is denied by reason of the lack of majority of active judges voting to rehear the case en banc. Judges Bowman and Wollman dissent from the denial of the petition for rehearing en banc. The petition for rehearing is also denied. The panel opinion in that matter, which was consolidated with No. 89-1957, Kalima Jenkins, et al. v. The State of Missouri, et al., and filed April 2, 1990, is withdrawn. A substituted opinion in both matters is filed simultaneously with this order.
 
 
 47
 BOWMAN, Circuit Judge, dissenting.
 
 
 48
 I respectfully dissent from the denial of the suggestion for rehearing en banc of the panel opinion filed April 2, 1990. The panel now has filed a modified opinion, supra p. 417, and has withdrawn the April 2, 1990 opinion.[1] Unfortunately, the modified opinion is as flawed as its predecessor.
 
 
 49
 Even though the panel takes pains in the modified opinion to make it appear the suburban school districts are being given a choice in the matter, the reality is that the Court effectively is decreeing a massive compulsory interdistrict transfer plan, one that the suburban districts will be forced to accept and implement on pain of being found guilty by this Court of racial discrimination if they do not. The question before us is whether a so-called voluntary transfer plan can be anything but compulsory when this Court already has signalled, in unmistakable terms, that the suburban school districts' refusal to accept large numbers of transfer students from the Kansas City School District pursuant to "a voluntary interdistrict program" will be "a very significant factor in determining discriminatory intent in the future litigation." Jenkins v. Missouri, 807 F.2d 657, 687 (8th Cir.1986) (Ross, J., concurring) (Jenkins I), quoted with approval in the modified opinion of the panel majority, supra at 418 and Judge John R. Gibson's concurring opinion, supra at p. 422 n. 7. The modified opinion of the panel majority, supra at 418 also quotes approvingly from footnote 30 of Jenkins I, which lauds the virtues of voluntary interdistrict transfer programs and concludes, ominously, that, "Whether a refusal of a district to participate in such a voluntary program may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation is an issue that we should not anticipate." Jenkins, 807 F.2d at 683 n. 30.
 
 
 50
 The case thus takes on an Alice-in-Wonderland quality. On the one hand, the suburban districts, not having been found guilty of a constitutional violation (and therefore having been dismissed from the Jenkins case) cannot judicially be compelled to take part in an interdistrict remedy. On the other hand, our Court has made them an offer they can't refuse: unless they start "voluntarily" admitting transfers from the Kansas City School District, they will be adjudged to be violating the Equal Protection Clause, and then will be subject to the full remedial powers of the federal courts. I think no more than this need be said to demonstrate the unmistakably coercive nature of the panel opinion.
 
 
 51
 An interdistrict transfer plan might or might not be a good thing. That is not the issue. The issue is the constitutional allocation of power, and whether our Court has been faithful to it. Clearly it has not. Instead, what we have here is a raw exercise of power in pursuit of what the Court perceives to be a noble purpose, namely, the dispersion of black students from the inner city into the mostly white suburban districts. This decision, if it is not overturned, will stand as a monument to the often tempting but always pernicious doctrine that arguably worthy ends justify illegitimate means. Moreover, it may have unintended practical consequences that will cause great harm to innocent school districts. When we tinker with local arrangements, we do so at great risk to the health of the body politic. Only when the Constitution commands it are we justified in intruding. Here, it cannot even be pretended that the Court's coercive order has a constitutional basis.
 
 
 52
 I am also troubled by the implicit premise that appears to guide the panel opinion, that premise being that black children somehow will be better off if they are removed from classrooms where they enjoy majority status and are transported to more distant classrooms where they will comprise a distinct minority. If this be truth, it certainly is not of the self-evident variety. The premise seems especially hollow here in view of the vast sums of money that are being judicially compelled from unwilling taxpayers to make the Kansas City School District second to none in the opulence of its facilities and in the plenitude of its educational frills. In any event, the idea that a good education for black students requires their submersion in a sea of white students strikes me as being patronizing and demeaning to blacks. As far as I know, it is unsupported by any empirical evidence. I find it offensive.
 
 
 53
 My essential quarrel with the panel opinion, however, is that it goes further than any court has the right to go. The words of Justice Kennedy, dissenting in Missouri v. Jenkins, --- U.S. ----, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990), are apposite here:
 
 
 54
 James Madison observed: "Justice is the end of government. It is the end of civil society. It ever has been, and ever will be pursued, until it be obtained, or until liberty be lost in the pursuit." The Federalist, No. 51, p. 352 (J. Cooke ed. 1961). In pursuing the demand of justice for racial equality, I fear that the Court today loses sight of other basic political liberties guaranteed by our constitutional system, liberties that can coexist with a proper exercise of judicial remedial powers adequate to correct constitutional violations.
 
 
 55
 For the reasons I have briefly stated, I would grant the petition for rehearing en banc on all the issues raised by the petition. As I read the petition, it asks us to rehear, inter alia, the issue whether the District Court properly granted summary judgment in favor of the suburban districts on the discrete claim of discrimination that is the gravamen of the Naylor appellants' complaint. I here express no opinion on the merits of that issue. I observe, however, that even if the Naylor appellants were ultimately to prevail on their discrimination claim, the sweeping relief that our Court has ordered would not be justified. When a state (or one or more of its subdivisions) is found to have violated the Constitution, the remedy should be precisely tailored to right the constitutional wrong, and should intrude no more than necessary upon state and local prerogatives. See Milliken v. Bradley, 433 U.S. 267, 280-81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). Here, our Court flouts that salutary teaching by effectively ordering (while pretending not to do so) a blunderbuss remedy that goes light years beyond anything that would be necessary to correct the constitutional violation alleged in the Naylor appellants' complaint--and it does so despite the District Court's grant of summary judgment for the suburban districts and despite the panel majority's concession that "a material factual dispute remains respecting the suburban school districts' racial motivation in refusing to accept black transfer students from the KCMSD." Naylor v. Lee's Summit Reorganized School Dist., No. 89-2452, Op. at 8 (8th Cir. May 23, 1990).
 
 
 56
 Our Court has acted with the best of intentions. Good intentions, however, are not an adequate substitute for constitutional authority, which here is sorely lacking. Nor do good intentions excuse judicial abuse of the Court's de facto ability to bully litigants into submission not to the law but to the Court's will. The illegitimacy of what the panel has done is so painfully obvious that I find it difficult to believe a majority of the judges of this Court would not feel duty-bound to grant the petition for rehearing en banc.
 
 
 57
 WOLLMAN, Judge, dissenting.
 
 
 58
 I agree with much of what is said in Judge Bowman's dissenting statement, and I too would grant the petition for rehearing in banc on all of the issues raised by the petition.
 
 
 
 [1]
 This Court's opinion modified the district court's requirement that the State pay the KCMSD the full student foundation allotment for each student transferring out of the district and authorized the formation of a citizens committee to monitor the interdistrict transfer plan. 807 F.2d at 684
 
 
 [2]
 Judges Lay, Heaney, and McMillian would have ordered compulsory interdistrict relief. Id. at 712 (Lay, C.J., dissenting). Judge Arnold dissented from that part of the Court's order which held that the suburban school districts could not be required to participate in an interdistrict remedy for interdistrict school segregation caused by the State's unconstitutional housing segregation. Id. at 687 (Arnold, J., concurring in part and dissenting in part)
 In late 1987, the Jenkins plaintiffs charged that the State of Missouri was not seriously committed to seeking the cooperation of the suburban school districts in a voluntary interdistrict program and requested the court to direct the state defendants to engage in further efforts and activities towards achieving such a program. Jenkins v. Missouri, No. 77-0420-CV-W-4, slip op. at 14 (W.D.Mo. Jan. 7, 1988). The court acknowledged that progress in achieving a voluntary interdistrict program had been slow, but denied plaintiffs' motion, stating that the newly-created subcommittee of the Desegregation Monitoring Committee was fully committed to assisting the state and the other parties in developing a program and that the subcommittee was the most effective means of achieving a successful interdistrict transfer program. Id.
 
 
 [3]
 We have consolidated this appeal with that in Jenkins v. Missouri, No. 89-1957. The Jenkins class appeals Judge Clark's denial of its motion to compel the State of Missouri to fund VIT expenses for the 1988-89 school year. Judge Clark denied the motion as moot because the suburban school districts admitted no KCMSD transfer students for the 1988-89 school year
 
 
 [4]
 The State of Missouri resisted the Naylor and Jenkins plaintiffs' requests that the district court order the State to fund voluntary interdistrict transfers because no VIT plan had yet been approved by the district court. The State also contended that it had no obligation to fund the plaintiffs' proposed transfers because Judge Clark's original order directed the State, rather than the plaintiffs, to implement a VIT plan. Judge Clark rejected the latter contention, noting that:
 there is nothing in the prior orders preventing the other parties from seeking the cooperation of other school districts in a VIT program. This is evidenced by the Court's statement that 'the newly created voluntary interdistrict transfer subcommittee of the Desegregation Monitoring Committee is fully committed to assisting the State and the other parties in developing a voluntary interdistrict transfer program.'
 Jenkins, No. 77-0420-CV-W-4 (W.D.Mo. Nov. 29, 1988), Order at 5 (quoting Jan. 7, 1988 Order at 14) (emphasis added to original).
 Judge Clark's opinion of June 14, 1985 also admonished:
 [T]he State of Missouri must demonstrate that they are seriously committed to seeking the cooperation of each suburban school district in the Kansas City, Missouri metropolitan area. If the State does not demonstrate its commitment, then this Court will seek other methods of accomplishing this task at the State's expense.
 Jenkins, 639 F.Supp. at 51.
 Additionally, Judge Clark has several times underscored the need for the district court to maintain control of and to finally approve any VIT plan that is to be implemented. E.g., Jenkins, No. 77-0420-CV-W-4 (W.D.Mo. Feb. 16, 1989), Order at 3; Jenkins, No. 77-0420-CV-W-4 (W.D.Mo. May 5, 1989), Order at 2.
 Despite Judge Clark's initial instruction to the State to propose a VIT plan in 1985, nearly five years have passed without the State demonstrating its willingness to propose such a plan. In view of the State's apparent reluctance to proceed, and because of the district court's repeated intention to retain final approval over any VIT proposal, we believe that the time has come for the district court itself to develop a VIT plan in order to implement the remedy called for in its June 14, 1985 opinion and approved by this Court.
 
 
 [5]
 Judge Stevens originally found the entire claim to be sanctionable. On reconsideration, however, the court concluded that plaintiffs' allegation of discriminatory intent was prompted by this Court's decision in Jenkins v. Missouri, 807 F.2d at 683 n. 30. Accordingly, Judge Stevens ordered Benson to pay half the defendants' attorney's fees
 
 
 [6]
 Professors Wright, Miller, and Kane have stated that:
 Cases premised on alleged violations of the constitutional or civil rights of plaintiffs frequently are unsuitable for summary judgment. As is true with cases involving important public issues, courts may refuse to grant summary judgment in these actions because it is felt that a fuller record is necessary in order to be able to decide properly the issues involved. Further, the very nature of the claims involved often presents factual issues that require summary judgment to be denied.
 In many constitutional and civil rights cases, a necessary element of the claim for relief presents an inquiry into the state of mind of one or more of the parties.... [C]laims requiring a determination regarding intentions or motives are particularly unsuitable for summary adjudication....
 Finally, in actions charging various forms of discrimination, in violation of the constitution or some statute, material fact issues may exist concerning whether the defendant intended or knowingly discriminated, thereby precluding summary judgment. Thus, for example, in cases alleging sexual or racial discrimination in employment or housing, an examination of motive and intent usually is involved, making the granting of summary judgment especially questionable.
 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2732.2, at 340-51 (2d ed. 1983) (footnotes omitted).
 
 
 [7]
 Judge Ross' concurring opinion in Jenkins v. Missouri, 807 F.2d 657 (8th Cir.1986) [hereinafter Jenkins I ], expressed the opinion that failure to organize and implement a voluntary interdistrict program would be a significant factor in determining discriminatory intent in future litigation. Id. at 687 (Ross, J., concurring)
 
 
 [8]
 While not in the record before the district court, publicly available enrollment figures demonstrate that black enrollment has continued to increase in four non-party suburban school districts, Center, Grandview, Hickman Mills, and Raytown, the districts that we recognized had made steady increases in black enrollment in Jenkins I, 807 F.2d at 664 n. 9. Insofar as this may be material in this case, the district court on remand may make appropriate inquiry and findings
 
 
 [9]
 These included children enrolled in special education programs, children whose families had moved from the North Kansas City School District, orphaned children, children whose legal residence was found to exist in the district by a court, foreign and domestic exchange students, and children of a non-resident person paying a school tax in the district. (Jt.App. at 1115-17)
 
 
 [10]
 The district court stated that several of the conditions in the North Kansas City School District's proposal were perhaps in violation of the equal protection clause, and questioned whether they would pass constitutional muster standing on their own, but further concluded that the issue was not before it. Id. at 816
 
 
 [1]
 The modified panel opinion 904 F.2d 415, is being filed simultaneously with this order denying rehearing en banc